So, who's the appellant? You have to be shy here. Not shy, I just try not to rush the court. Thank you very much. Anytime you're ready, we're ready. Thank you. Stephen Munkel for Appellant Matthew Fogel. May it please the court, I'd like to shift the focus a little this morning. In our brief, we tackled directly the trial court's ruling that the officers here were entitled to qualified immunity essentially because they didn't have fair warning that this was protected speech under the First Amendment. I'd like to shift from the First Amendment focus here this morning to the Fourth Amendment focus of whether the officers had probable cause to arrest. Because, if they did not have probable cause to arrest, then clearly they're not entitled to qualified trial, not hear an appeal from a summary judge. Did you make the Fourth Amendment argument in your brief? As a detailed argument, no. There's a reference to the lack of probable cause. And where is that? First, it was in the trial court's ruling that the court specifically found there was probable cause to arrest. Yeah, where is it in your brief? In the page cite in the brief. Well, of course, we've referenced throughout that there's no intent to threaten, which is a problem. It's not in your issues in your brief. You've got two issues and probable cause to arrest is not an issue as stated. All right. You know what I'd like to talk about is the district court's ruling that there's insufficient showing of policymaker on the Monell question. What showing do we have, if any, that Officer Johnson was a policymaker for purposes of Monell? Well, we had the testimony in the deposition from both Sergeant Hooker and the deposition from Captain Johnson. Captain Johnson was the designated decision-maker for the department on that day and those circumstances. He's a captain in the department, a second-in-command essentially under the chief. The chief is not available, so he's the designated decision-maker, policymaker for the department. And he overrules Hooker's judgment. That's correct. He goes out and says, looks like satire to me. Johnson says, uh-uh. And it's Johnson who makes the decisions not only go back, talk to him, have a look, but also it's Johnson who makes the decision to hold him in jail overnight. Well, we believe that that interpretation is appropriate under the facts and given the interpretation in favor of our position at this level in the case. Captain Johnson clearly overruled Sergeant Hooker in the telephone conversation. There's not an explicit admission that he directed him to make an arrest in the way that the testimony is given at the depositions, but we think that inference is certainly there, that Sergeant Hooker accepted it as an order that he was to make an arrest. And do we have inference in the record from which we could say that it was Johnson's decision that resulted in him being held overnight and Johnson's decision that results in the requirement that before the van will be released, all the writing, except I guess the word please has to be painted over? I think that's a fair inference from the facts, yes. We don't have that direct statement or admission. And of course we have the routine aspect of arrest, booking, release circumstances, which is part of the duration of the custody. Once the booking officers have left him at the jail, then appellant was left to his devices as to whether he could arrange bail or had to wait a period of time to appear in court before magistrate and request bail or what that took. And what time was he put in jail and the bail set? So I'm trying to figure a handle on how realistic it would have been to say to Mr. Fogel, now listen, get bail and get out of here. You don't have to spend the night. What time did this take place when he was told, okay, you're in jail or raise the bail? I think the record indicates that the initial contact, Sergeant Hooker observing the van was probably late afternoon, that the investigation at the scene, what with going back and getting direction from Captain Johnson and bringing the officers back, contacting Mr. Fogel and so forth, took a period of two or three hours, so that he's arriving at the jail in early evening hours and then it takes essentially until the next morning before his bail could be posted and he could arrange his release. And so he was in the end released on bail and then the decision not to file formal charges was reached sometime later? Correct. Not much later. In the bureaucratic situation, that would have been reviewed by the district attorney's office after submission of written reports by the Grass Valley police officers involved and then their decision to decline to prosecute is made some days or weeks later. Okay, so when he gets out, it's not because they've decided not to press charges, when he gets out it's because he posts bail. Correct. I have a question and it goes to exactly where you started with the arrest. Go through the whole scenario, the police, Sergeant goes out to investigate, goes back and asks the captain, this is what I had, the captain says go out, investigate again, four officers show up, they talk to the guy, he goes down, opens the van, no bomb, whatever, and then they decide to arrest him. Let's assume that we now look at qualified immunity at that point. Correct. And so you have to look at qualified immunity as to what happened on the investigation. Let's assume we get past that, saying well, there was enough there, homeland security, 9-11, whatever, we should at least talk to the guy, which they did. But they not only talked to him, they arrested the guy, throw him in jail, and then when he goes to get his van, they say hey, you've got to take all the signs off. Alright, what would a reasonable officer think for qualified immunity as far as the law is established if they let him go, no arrest, and said look, just cool it, have a nice day. So he goes down to his car again, another phone call. The lady says uh-oh, I've got a car out here that says there's a bomb in it. So they said oh, don't worry about it. Pretty soon there's more phone calls. How does the police on this roving, alleged threat that has been disarmed or found to be not if you will, a real threat, how do you let this thing keep going on the first time? In other words, it's the first time the police have seen it, there's no case, we never found any case specifically on point, and if we're looking through Saussure, isn't there qualified immunity for at least for them to make that first determination? I'm not talking about tomorrow when he goes down the street and does it again. But how do the police supposed to know what the law is when this guy's got this thing and at least the captain thought we ought to investigate and look at it, at least they had one phone call that said I'm scared. Well, before this event occurred we had Virginia v. Black decided, which indicated that there has to be, in order for speech to violate the true threat limits and be unprotected speech, there has to be an intent requirement establishing No, I say it's protected speech. Oh heck, it's protected speech. So since the officers have investigated and found out, among other things, that the person has no intent to actually threaten and doesn't present harm, then when they get additional citizen complaints, they're placed in the position of being advocates for the First Amendment and saying we've checked that out, it's not a threat, it's a political message. So a guy comes up with a shotgun and blows a hole in the side of the truck saying I'm not going to have a bomb around here, there's a riot, so what are the police supposed to do with this roving problem that's going around the streets with this big sign on it? Well, the situation is not one... I'm only talking about qualified immunity. I'm not talking about if we tell them to suck it up and go ahead and deal with it in a decision, but I'm talking about the first instance they say what are we going to do with this truck? Well, and what I'm saying is that the First Amendment, as I think is shown by the cases in our brief, was very clear at the time that what they do is leave the message alone. There's no First Amendment case on a truck with this wording on the back that keeps moving around town. There will never be two First Amendment cases on political speech where you have the same message or circumstances. It's the nature of political speech that it changes day to day what is the message that you want to give. It's certainly not... But what's the closest case you have to this? Pardon me? What's the closest case you have to this? I mean, the message may be different, but the problem I think is not all that unique. Well, one case that's close is Cohen v. California, of course, where you have F the draft in a courthouse, and the prosecution was under one of the same penal code sections where Mr. Fogle was arrested for, penal code section 415. And the court said provocative speech, even that may raise strong feelings or... Yeah, but where was the speech in that case? What was the nature of it? It was written on a T-shirt, as opposed to the back of a VW van. But I think that case is quite close, both in the nature... Was there anything threatening about that speech? Did anybody have reason to think that fucking the draft was going to cause something to explode and hurt themselves? It was the same kind of argument as the arrest under 415 here, which is the fighting words kind of situation, which was addressed originally by the Supreme Court in Szyplinski, saying that in order to be fighting words that are unprotected, it has to be directed to an individual or specific group, and it has to be words that would clearly call for an immediate violent reaction. What the court is positing is that there's a fearful reaction. That's something different. I'm not talking about somebody whose reaction is because I hate your political message. I'm talking about someone who's reacting saying, there's a truck that says there's a bomb on board. Isn't that something different? I mean, they got at least one woman who called in and said, there's a truck that's got a bomb on board. And that... She's not reacting to, I don't like your politics. Oh my God, you're going to blow up the neighborhood. Isn't that different? Well, the First Amendment allows you to make provocative statements where the emotive content is stronger than the cognitive content. My point of this is not to argue the First Amendment. The question is, what do you have to offer us to say it was so clear to, for the qualified immunity issue? And you gave me a case that really isn't very close at all in my mind, because it poses no threat to the people in the environment, in the surrounding area. Well, in context, the words are always required to be viewed in context. In context, there is no threat here. There is not an active verb in that statement except the word jihad, and that is specifically in a statement, jihad on the... F-bomber? That's a... Mass destruction on board? I am an F-suicide bomber. It's a state of being statement. It's not an active verb. It's not a threat to do anything. The only... You're arguing in the intellectual sense. We're talking about a street police officer who's under duty. He can't ignore the... Do you think he can ignore this van that's on the street? I think it would be reasonable, given the parenthetical P.S. comment at the bottom of the message about W.O.M.D. on board, which I think in context is clearly satirical, but... It's very intellectual, but we're talking about what a police officer, under the duties of a police officer to protect the public, does when he sees this van parked outside and will continue to go down the street, park other places, and they've had one phone call already, and the captain's already had a little problem with it. Now, it might be disputable for First Amendment. We're saying it is First Amendment. It's total First Amendment. The question is, it's that threat on the back of the van that keeps moving around. And it's directly related to the function of the police after, if you will, after 9-11, that people are afraid of bombs, especially weapons of mass destruction. As the nominee for Attorney General told the Senate yesterday in his first hearings, we can't allow the threat of terror or the concern about terror to remove our liberties. And that applies down at the level of the police officer in the street. It is reasonable in this situation with this message for the officers to contact the person. But when they do so, they find a 22-year-old college student who says, that's my political message. And at that point, they have absolutely no basis to arrest him. That's a First Amendment argument. We're talking about what they're doing with the sign. They know he's harmless, but the sign is what it is, and it's roaming around town. Correct. And it's generating some responses from people, which is what it's intended to do, to generate an emotional response. It's intended to generate a response. I take it your client understands it's going to generate a response? Does he understand it's going to generate a response of, oh, my God, and there may be a bomb in the neighborhood? I think the record indicates he expressed to the police officers during their inquiry that he intended to create a response, that he wanted people to be scared. Is that the response? He wanted people to be scared about the possibility of a bomb being there? You may talk your way out of a First Amendment argument now. I think he wanted people to be scared more so about the threat to the First Amendment. I think his testimony is he wants to, quote, scare people into thinking, close quote. I think that's correct. But he wants to scare them. Correct. He didn't want to make them laugh. And in the Watts case, when the speaker at the Washington Monument tells a large group of people that if he has a rifle in his hands, he's going to put his sights on the president, that's a specific threat. It's actually stating a potential for violence that he intends to carry out. Here we have only the potential and no indication of any intent to carry out any violence, any act that would harm another individual. In addition, also under Virginia v. Black, I think we have to look at, is the message addressed to a specific individual or group? And it is not, which, again, is part of the context that makes this a political, purely political message that's obvious on its face. In fact, the first officer on the scene who analyzed it that way. You know, I'd like to bear down on Judge Bonetti's question or line of questioning. The district court held that this was protected First Amendment speech. And Judge Bonetti, for his questions, is assuming that that's so. And for the purpose of my question, I will also assume that that's so. If it's protected First Amendment speech, nonetheless, an officer on the street reacting to that has qualified immunity if he's making, I'll say it on a double negative, a not unreasonable mistake. Of course, the city doesn't have that same qualified immunity protection if a decision is made by a policymaker. I'll leave that to one side for the moment. So the question really is, a police officer confronted with this, how far can that police officer go with saying, well, you know, maybe it's First Amendment, it's a close question, we're not going to award damages against that police officer for stopping, for investigating, figuring out, you know, is it a true threat? At what point, if any, does the action of the individual police officer become unreasonable? I don't think, for example, it's unreasonable for him to stop and ask questions. I agree. I don't think it's unreasonable for him to say, can I look in the van? I agree. I don't think it's unreasonable for him even to say, you know what, why don't you stay here for just a minute? I want to see if you're on the Nevada City nut list. I agree. There's a certain amount of investigation, it seems to me, that a prudent officer is perfectly entitled to undertake. And I don't disagree. But then you make an arrest. You violate the person's Fourth Amendment rights because of your disregard for his First Amendment rights. Yeah. But then we've got two questions. One is, at what point do you find that the officer acted so unreasonably that the individual officer is liable for damages? Or, for purposes of this case, if we were to find that Johnson is a policymaker, qualified amenity falls out of the case as to the defendant's city. Because at that point, it's just a question of First Amendment violation because that decision, if made by a policymaker, was not made on the square of the moment. It was made with reflection and made by a policymaker. Correct. So, for the moment, I want to stay with the qualified amenity because the law, I think for good reason, is reluctant to impose damage judgment on individual officers who make a reasonable mistake. And I'm trying to figure out, even assuming that it is First Amendment violation to have arrested him, is that an unreasonable mistake for the individual officer to have made? And our answer is yes, because Cohen tells us that provocative speech is protected. Virginia v. Black, among others, tells us that there has to be a specific intent to threaten or harm before you can lay outside prosecution. And whether it's entirely rational or not, our system assumes that the officer on the street knows the well-established law and can make reasonable applications. I'm just reaching here. It's all fact-driven, every one of them. And this fact situation is totally different than the rest of them. And with this moving sign, it's just a little bit different situation. So, again, as Judge Fletcher says, here you have the individual police officer who is faced with this situation. We're not talking about the policy people. He takes the person off the street, takes the sign off the street. Now, is that protected conduct in the sense that they're going to get qualified immunity against damage? That doesn't mean it wasn't protected speech. Everybody's agreeing to that. And that's the only thing that kind of perplexes me. I think you've answered it. I mean, I think you've given us your view. You know what? Let's do. I've deliberately let this argument run over. We've got two First Amendment cases. I don't know whether you want to stick around for the next one. But we've got two First Amendment cases. And it seemed to me probably to violate the First Amendment to discriminate in terms of time. So I de facto enlarged your time to 20 minutes a side, just as the second First Amendment case will have. But you are now 18 minutes and 35 seconds into your 20 minutes. So why don't you sit down. We'll let the other side talk, and then we'll give you a chance to respond. Thank you. Good morning, Your Honors. I brought pictures that have been presented to you in binders. The same pictures that were in the record? Yes, Your Honor. There, Justice Brunetti. I don't know whether those pictures help you or hurt you, but those are the pictures. I've been writing as the argument has been going on, and I keep coming back to context, context, context, the facts. Now, you know, if you could move them over to that side so that the attorney can see us, or perhaps he wants to move over a little bit. I don't want to block the attorney's view of the bench. And we've got them, so we don't really need those. Yeah, don't worry. Good morning, Your Honors. If anyone wants to show them to the audience, we've seen them. We know what's there. Okay, just leave them there. They're fine. Okay, perfect. Okay, let her rep. It's the context. It's our officers. If I could quote from the Guilford case, police officers have a difficult job, and they deserve the respect of their communities, but they also should not violate the constitutional rights of other people. But when you're the officer on the scene and you've received a call from a woman who's concerned because she's a single mom with a kid and she sees this parked in her parking lot, it's important to understand that this is not a case where officers were driving down Highway 20 between Nevada City and Grass Valley and said, whoa, we're going to pull that guy over and put on the red light. This is a case where they are responding to a concern. First off, let's get a little see how much of the underbrush we can clear away. Do you agree or disagree with the district judge's conclusion that after everything is thought through, that this is protected First Amendment speech? I disagree. So you think this is not First Amendment speech, period? I view it as something that frightens people, and under the Schenk case you don't get to scare people. Oh, but of course you get to scare people in some circumstances. What's Halloween all about? Correct. Halloween, however, is a recognized holiday in the United States and where you expect kids to be going around in different costumes and vampires. But what I'm after is simply scaring people is not enough. You've got to say more than that. So what more is there here that makes this not protected by the First Amendment? The times in which we live. On 9-11, when the people woke up that morning, did they think that there were going to be planes going into the Trade Center? No. They got up and went to work. They fed their kids. They sent them to school. And then the planes hit the Trade Center. That changed all Americans' memories and the manner in which they address things. You don't get to look at this particular case or any case with 20-20 hindsight. If the officers had determined this is protected speech, we're not going to bother Mr. Fogel, this anonymous woman is being unrealistic and left, and the bomb blew up, we would be here on a different case, and there would have been headlines of 500 people in this apartment complex who are dead now because officers determined it was political satire. After they've talked to him, they've looked in the van, there's not a bomb there, and then they arrest him? Then you get back to what Justice Brunetti said. They'll arrest him again in a half an hour. They'll arrest him again in 45 minutes. This particular message was printed on the back of this vehicle about, I want to say, three or four hours before the first phone call. It was printed by Mr. Fogel at his parents' house in Nevada City. It stayed there in his parking driveway until he drove to his friend's apartment in Grass Valley. And within less than a half an hour of parking it there, the first phone call came in that the officers responded to. We're back to context and the underlying facts. If Mr. Fogel wanted to print this on the side of the wall in his bedroom and friends that came over he discussed it with, no problem. If he was at actually a political rally and he pulled this up and discussed it with all the protesters in Nevada City, different context, like the Watts case. It's a different context. Cohen fucked the draft. That was on a jacket that he wore into a courthouse. If he was walking down 7th Street in San Francisco, people would go, oh, I agree with him, or, you know, that guy doesn't like the draft. He walks into a courthouse. It's a different context. There's also a context issue relative to what the message is. Each one of these cases you've cited has a different message. Why does this message provoke what you say would be the officer's duty to arrest and then impound the car and then say you must remove the sign? The officers didn't do that in a matter of 5 to 10 minutes, and they didn't do that in their initial thought process. They found Mr. Fogle. They discussed this with him. The officer's testimony was that he said, I wanted to scare people. And they were like, no, you don't get to scare people. And then he shifted to, oh, I want to scare people into thinking. Sergeant Hooker testified that Mr. Fogle told him, I want to scare the residents of Nevada County the same way the residents of Iraq are being scared by the U.S. military. They said, no, you don't get to scare people. You don't get to put words there that would invite a violent reaction, false bomb threat. The whole point of it is false bomb threat. And then after doing the investigation and speaking with Mr. Fogle, they put him under arrest for the three penal code sections and impounded the van saying you get it back when you take the threatening words off. If Mr. Fogle had wanted to take off weapons of mass destruction or had wanted to take off suicide bomber, he could have still gone around with, you know, fucking jihad on the First Amendment and I'll appraise the Patriot Act and make a determination if that doesn't scare someone. He chose to take it all off, which, you know, fine. Thank you. Is the record clear that they said if you just take off the terrorist and the weapons of mass destruction, it's okay? No. The record is that they discussed it with him, arrested him, impounded the van. I think it was Sergeant Hooker that Megan Burns took his deposition and she went through, well, what if he left, please. And Sergeant Hooker is the one who initially thought it was political satire. And he goes, well, yeah, I don't see that as threatening. But that lengthy discussion did not go on in the parking lot that night. Where Mr. Fogle never volunteered, well, I've got paint in the back of the van and I'll just take this off. No, but what I'm asking is he ends up painting over everything, at least, I think everything, please, because I see a picture on the record that the only word left is please. Yes, but he painted over that also later. Later. Do you know how much later? That same, before he left the impound lot. Okay. So I'm trying to figure out, is the record clear as to what the actual requirement was on Mr. Fogle as to whether he marked out or painted out more than just  No, the record would be subject to interpretation because the officer said take the threatening words off. So it would be up to him. And he appears to have interpreted it as he better take everything off, including, in the end, please. Yes. Oh, well, please is pretty threatening, depending on who says it. I'm married, I know what you mean. My mother says please. That meant I was in trouble. I hear you. Matt, might I address Menil just briefly? Oh, yes. Let me make the rules clear. It's 20 minutes aside, so, yeah, you're fine. Where am I? You've got 12 minutes and 42 seconds. I'll take two of those on my own. We may take more than that, but time is not going to be your problem here. Okay. We argued that the actions were discretionary and subject to qualified immunity. The California government code, it's in the papers, 38630A, states that a police department is under control of the chief of police, and the appellant has made the argument that the chief of police designated control to the captain, who was the supervisor at the time, Johnson, and that Johnson then passed the baton to the Sergeant Hooker, who initially went out, and then Hooker passed the baton to Jason Perry, who was the investigating officer who actually made the arrest. But the case of Brown versus the city of Berkeley says that the section providing that a police department of a city is under control of the chief of police does not apply to charter cities, but only to general law cities. It's very important to note that the city of Grass Valley has been a charter city since 1893. You can find that out on their website. So then we cite the city of St. Louis versus, I can never say this name right, Pratt-Rutnick, it's a 1988 case, that says simply going along with discretionary decision made by subordinates is not delegation to them of authority to make city policy for purposes of upon municipality. This is a case where Captain Johnson looked at the photographs. These photographs were taken by Sergeant Hooker digitally. He sent them forward to Captain Johnson. He looked at it and went, maybe you're right. What do we do if the van blows up? You need to go investigate it. And Captain Johnson specifically testified at deposition that he left it to the discretion of Sergeant Hooker whether he was going to follow all the policies with regard to investigating bomb threats or whether he was going to talk to Mr. Fogel and come to a decision whether or not to arrest. So it was within the discretion. I'm sorry, Your Honor. No, I just want to make sure I'm clear. I think I know what you said and I think I know what I read. He was the investigating officer on the scene when he took these pictures digitally. And you said he forwarded them to the captain. So he stayed on scene. Yes. He made at least one trip back to the police department. That's what I thought. He went back to the police department. He went back once. I want to say, Your Honor, that Captain Johnson was on call. So Sergeant Hooker went to the police department to a computer to forward the photos. Because I wanted to figure out where the communication went between the sergeant and the captain. So the sergeant went back, he looked at it, and he took the pictures, went back, and then he sought advice of the captain because he was concerned, as I remember. Yes. And so the captain then was able to see the digital pictures, which I didn't realize. Yes. And the phone conversation ensued, which resulted in the sergeant going out a second time. Yes. And assigning it to Officer Perry to investigate. And during that is when they called Homeland Security, traced the license number, because Mr. Fogle did not live at this apartment complex. Now, is there, in your view of policymaker, in the city of Grass Valley, who, if anyone in the police department, is a final policymaker for purposes of Monell on a question such as this? Chief John Foster. And only him? Well, I suppose he goes on vacation and gets sick. So if there was a situation like that, I would go to the captain. And he goes to sleep? John Foster doesn't sleep. Well, when he's been awake for the third day in a row, I don't want to deal with him. Now, when he goes to sleep, what happens? Is there a final decision-maker other than the chief of police who is now asleep? It would be the captain who would make an on-the-scene decision. But that, in my opinion, is not necessarily changing the policy or creating policy for the city of Grass Valley, because it would each be an individual decision-making process with regard to a response to each set of facts. But our case law is very clear that it can be policy within the meaning of Monell, even though it is a discrete decision directed to a discrete event. That doesn't save it from being policy. The issue is who is making the decision. In this particular case, it would have been Officer Perry who decided to arrest. He made the arrest. Where is Officer Perry in the hierarchy here? He's now a detective. At the time, he was a patrol officer, and his immediate supervisor was Sergeant Hooker, who took the photos, who was on the scene. And Hooker's supervisor is Johnson? Yes. And who's Johnson's supervisor at that time? Chief Foster. So Foster's home asleep or home because it's after hours for him. I guess Johnson's in charge? Yes. And Hooker goes back and says, okay, I'm going to do these things, because Johnson said, you know, I disagree with you, because Hooker's original decision was this is political satire. But Johnson still left it to his discretion. He testified at deposition, I expected Sergeant Hooker to exercise his discretion. I expected him to exercise his discretion. After I saw him, I disagreed with him. I sent him back. But, Your Honor, you're making it black and white, and it's not black and white. It's Captain Johnson looking at it going, what if it blows up? I agree. Here's where I'm coming from. It seems to me that if there was a decision made by Johnson. Now, if Johnson made a decision, I think Johnson was a policymaking decision maker. Now, it's possible that on the record of this case, when it's fully developed on these points, that with respect to what was actually done, it wasn't Johnson who made the decision. But it appears to me that Johnson is, at least in my own view, I don't speak for my colleagues yet, in fact, I usually don't, it appears to me that for the purpose of Monell, Johnson is a policymaker. Now, there may be dispute as to what he decided and what effect it had on the events here. So why isn't Johnson a decision maker under our case law? Okay, let's say Johnson is a decision maker. Johnson's decision was go further investigate. He didn't say arrest him. He didn't say go arrest him. He didn't say make him take the words off. He said go further investigate. You should contact Homeland Security. You should find out the threat level. You should find out whether they know who Mr. Fogel is, who they did. But he didn't say go arrest him. Do we have anything in the record as to whose decision it was or whether Johnson knew about the fact that he was arrested and put in jail overnight? I don't believe it's on the record. Johnson found out later, but I don't believe it's on the record. I don't know if anybody asked him that at deposition either. I mean, I know because I talked to him. But on a point as potentially sensitive as that, we better stick with what's in the record. Yes, and it is in the record that he told him go further investigate. And Johnson testified at deposition also that in his mind a crime had been committed. If there was a bomb, then it was definitely a threat. If there wasn't a bomb, it was a false bomb threat. But he didn't go down to the scene. He's never met Mr. Fogel as far as I know. And he didn't arrest him or make the determination. He told Sergeant Hooker go do your job. But Johnson said in his view there was a crime. Yes. I want to say at deposition he said, yeah, in his mind there was. But he didn't tell Sergeant Hooker what to do. And under qualified immunity, that's been beat to death. It protects all except the incompetent or those who knowingly violate the law. And as we've discussed here thoroughly, some officers, political satire. Some officers it was a threat. Some people, I've shown these to people at bar meetings, and some people laugh and go that's so far over the top, you've got to be kidding. And other people are like, oh, my God, that guy wouldn't make it a block down the road. So how do you expect officers at the scene doing their job to make a determination? They're not the judge and jury. They're not the ones that are going to decide. All they're going to do is protect the citizens of Grass Valley that they're supposed to. They have a right to qualified immunity. And over in context, the times that we live in, the statements that are made, and people don't want to wait until the bomb blows up. Thank you. Thank you very much. Rebuttal? We'll give you a couple of minutes if you'd like. The two things in the record that indicate that Captain Johnson was the policymaker who required the arrest are the statement attributed to him, to Sergeant Hooker, that you should treat this as a bomb threat. That's a pretty directive statement. It's the clearest one we have attributed to Captain Johnson directly. But that's not the source of the problem. Treating it as a bomb threat doesn't produce the arrest. And you haven't quarreled apparently with the notion that at least some investigation would be appropriate. So I don't know that that says that there's an official policy to do what you think constitutes a First Amendment violation. But then what the events that occur after that statement is made are that they go back out, they investigate, and then they make the arrest for false bomb threat and other charges when there's Sergeant Hooker and the four other officers who respond to the scene. It's not the captain. It's the sergeants. Now the sergeants become the official policymaker for the city. Well, I think that interpretation is open under the case law, but it's my view that the facts of this case show that the decision is actually made in a directive fashion by Captain Johnson and that the sergeant and the other officers are carrying that direction out. And, again, when you get down to the point where they have done the investigation, and we are not saying there's a constitutional violation in doing an investigation of these circumstances, but when they have done the investigation, they end up with no probable cause to arrest for any of the charges they actually arrest him on. We're not on probable cause for arrest. I think if you want to make that your best argument, go ahead. But we're not on probable cause to arrest. Well, but it ties into the motivation for the conduct, which then is part of are they carrying out Captain Johnson's direction or are they doing what a reasonable officer does? Following investigation, a reasonable officer makes an arrest when he has probable cause and doesn't make an arrest if he doesn't. I'll tell you what bothers me. Unless Johnson's word at an original instance is the key point, Johnson laying home in bed sleeping cannot make policy as it unwinds because nobody knew what the facts were when Johnson got the first facts. You saw the pictures, but nobody knew what the facts were. So if Johnson goes back to sleep and he says you should investigate this as a bomb threat, what happens later cannot necessarily be Johnson's decision. Taking the facts in the view most favorable to our side, Captain Johnson knew that this was protective speech and directed that it be treated as a bomb threat. And Sergeant Hooker understood that that meant to make an arrest regardless of your investigation. That's the most favorable interpretation of the facts. I think we've heard a lot from both sides. Thank you both for very useful arguments. Case of Fogle v. Grass Valley Police Department et al. is now submitted for decision. The next case on the argument calendar is, and I'm not sure I'm pronouncing this correctly, Carboon v. City of Chandler.
judges: Brunetti, Fletcher, Clifton